**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **CYNTHIA MCGEE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LEAVENWORTH SCHOOL DISTRICT (USD 453), DR. CATHY REDELBERGER, STEFANIE BOURNE, and JENNY ORBIN,**<br><br>**Defendants,** | ) | **CIVIL ACTION**<br><br>**No. 26-2362-KHV** |

## MEMORANDUM AND ORDER

On April 4, 2026, Cynthia McGee filed suit *pro se* in the District Court of Leavenworth County, Kansas against the Leavenworth School District and three district employees in their individual and official capacities: Dr. Cathy Redelberger, Stefanie Bourne and Jenny Orbin. On May 21, 2026, plaintiff filed her First Amended Complaint (Doc. #1-2) under 42 U.S.C. § 1983, alleging that defendants violated her civil rights under the Fourth and Fourteenth Amendments, U.S. Const. amends. IV and XIV. On June 19, 2026, defendants removed this action to this Court. Notice of Removal (Doc. #1). This matter is before the Court on Defendants Dr. Cathy Redelberger, Stefanie Bourne, And Jenny Orbin's Motion To Dismiss (Doc. #9) and Defendant USD 453's Motion To Dismiss (Doc. #10), both filed June 25, 2026. For the reasons stated below, the Court sustains defendants' motions.

## Legal Standard

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement of relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss,

a complaint must contain sufficient factual matter to state a claim which is plausible—not merely conceivable—on its face. Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679. The Court need not accept as true those allegations which state only legal conclusions. See id.

Plaintiff bears the burden of framing her claim with enough factual matter to suggest that she is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. See Twombly, 550 U.S. at 556. Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendants are liable for the alleged misconduct. Iqbal, 556 U.S. at 678. Plaintiff must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent with" defendants' liability. Id. (quoting Twombly, 550 U.S. at 557). A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Id. Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief. Id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

When ruling on a Rule 12(b)(6) motion, the Court does not analyze potential evidence that the parties might produce or resolve factual disputes. Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002). The Court accepts well-pleaded allegations as true and views them in

the light most favorable to the non-moving party. Sutton v. Utah State Sch. For Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).

Because plaintiff proceeds *pro se,* the Court construes her complaint liberally and holds it to a less stringent standard than formal pleadings drafted by lawyers. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). The Court, however, does not assume the role of advocate for a *pro se* litigant. See id.

**Factual Background**

Plaintiff's amended complaint alleges the following:

Cynthia McGee is the mother and a legal parent of G.M., a minor child who attended Earl Lawson Elementary School ("Lawson") for three and a half months from September 3 to December 15, 2025. The Leavenworth School District is a municipal entity organized under the laws of the State of Kansas and operates Lawson. While G.M. attended Lawson, the district employed Dr. Cathy Redelberger as Interim Superintendent, Stefanie Bourne as Principal and Jenny Orbin as school counselor.

During 2025, McGee and her husband, G.M.'s father, began divorce proceedings which ordered temporary joint legal custody and shared parenting arrangements concerning G.M. The McGees withdrew the divorce proceedings in December of 2025.

Since 2020, McGee had homeschooled G.M. and her siblings. On September 2, 2025, the domestic relations court directed the parties to appear together the next day to enroll G.M. in Lawson for a trial period, at the father's request. On August 21, 2025, the father had initiated enrollment procedures and obtained access to PowerSchool (a student information technology platform for G.M.), without McGee's participation. After the enrollment meeting, McGee repeatedly requested access to PowerSchool, but access was delayed for approximately two weeks.

On September 3, 2025, McGee arrived at Lawson with G.M. to attend the enrollment meeting. The father had already arrived and was in the school office. School staff informed McGee that she did not need to come in because the father had already registered G.M.

McGee presented G.M.'s birth certificate, identifying both parents as legal parents. Staff copied the document for G.M.'s records. McGee informed staff of an upcoming medical appointment for G.M., which was scheduled during her parenting time, and advised staff that the required documentation could be transmitted directly from G.M.'s pediatric care provider. During the enrollment meeting, staff requested address verification documentation only from the father. They did not ask McGee to complete or sign documentation relating to G.M. In McGee's presence, a staff member then asked the father whether McGee should receive pickup authorization materials for G.M. The father agreed, and staff gave McGee pickup signs for school dismissal.

McGee informed school staff of religious objections concerning holiday-related school activities and requested notice regarding related classroom participation. McGee asked that school-related communications concerning G.M. be shared equally with both parents and provided written notice regarding the parties' joint legal custody status. She included the father on the email thread, and school personnel acknowledged receipt of the information.

During G.M.'s first days at school, McGee experienced restrictions concerning parental access and interaction with G.M. On September 9, 2025, the father remained with G.M. inside the school prior to class entry. McGee advised the father to take G.M. into class and stated that she would come back later that day to visit G.M. without his supervision. McGee arranged a time to go to the school later that day to visit with G.M. McGee arrived at the school at around 11:00 A.M., and waited in the office area for approximately 30 minutes before school staff informed her that the principal (Bourne) was unavailable and to call for another time. McGee scheduled to

return at 1:00 P.M. School Counselor Orbin informed McGee that Bourne was still unavailable and that she would provide McGee a tour of the school. During the tour, McGee asked whether she would be permitted to briefly see G.M. Orbin responded that it might be possible depending upon classroom circumstances. McGee and Orbin approached G.M.'s classroom, where G.M. waved at her through the window. McGee asked to briefly interact with G.M. in the hallway with Orbin present. Orbin denied the request, citing hallway safety procedures regarding unsupervised children; McGee observed other students in the hallways during the same time period, however, without direct supervision.

Orbin escorted McGee from the building without further interaction with G.M. Later that day, McGee requested permission from the father to briefly visit G.M. during his parenting time, since she had not meaningfully interreacted with G.M. during the earlier school visit. The father agreed. After school dismissal, McGee waited outside while displaying the pickup sign. The school released G.M., accompanied by her teacher, to McGee. McGee was concerned that G.M. appeared ill. G.M. stated that she felt ill, had been crying and believed she could not leave. McGee asked G.M.'s teacher whether G.M. had appeared ill or visited the nurse during the school day. G.M.'s teacher responded that G.M. "seemed fine" and had had "a good day."

While McGee waited for the father outside the school with G.M., multiple staff members approached McGee and questioned her about when the father would arrive. McGee informed staff that she was willing to remain with G.M. until the father arrived, so staff could conclude dismissal duties. Bourne stated that instead, she would contact the father. She requested his work contact information from McGee. McGee gave Bourne the information and again stated that she could assist with pickup arrangements if the father was delayed in the future. The father then asked Bourne whether his mother (G.M.'s paternal grandmother) could be added to pickup authorization.

Bourne informed the father that through communication with the school, he could authorize the grandmother for pickup. Following the interaction, McGee entered the administrative office and questioned school personnel regarding the restrictions imposed upon her interaction with G.M. and the differing treatment afforded to the father concerning pickup authority. McGee informed Bourne that no court order restricted her custodial rights, that she and the father shared legal custody of G.M. and that the father had not been required to provide comparable custody documentation before the school recognized him.

Later that evening during video visitation, G.M. asked McGee to bring her backpack to school, because she did not have one at the father's residence and she wanted to see McGee again. McGee arranged with the father to take G.M.'s backpack to the school.

On September 10, 2025, McGee arrived on school property with G.M.'s backpack and court custody documentation, displaying the pickup sign. McGee could not enter the locked building prior to dismissal and could not immediately provide the requested custody documentation to the office. After the dismissal time, G.M.'s teacher released G.M. to McGee. McGee sat outside on the lawn area with G.M. to wait for the father. G.M. informed McGee that she had vomited and had been crying during the school day because it was too long. While McGee remained outside with G.M., the counselor (Orbin) and two additional staff members approached and surrounded them. Orbin instructed G.M. to return inside the building to wait with her teacher until the father arrived. McGee informed staff that she had brought G.M.'s backpack and intended to provide the custody documentation that Bourne had requested. McGee stated she was waiting with G.M. until the father arrived because G.M. appeared ill.

Orbin stated that G.M. was in their custody until the father arrived and instructed G.M. to go back inside the building. McGee entered the school office and questioned the restrictions which

the school imposed. Bourne again informed McGee that additional custody documentation would be needed before she could recognize McGee for pickup authority or parental access. McGee then presented the custody documentation. Staff reviewed it and stated that copies would be placed in G.M.'s file.

Although McGee had presented documentation of joint legal custody, staff did not let McGee continue waiting outside with G.M., and G.M. remained inside the building with staff to wait for the father. McGee returned to her vehicle and saw the school release G.M. to her paternal grandmother. The paternal grandmother did not possess custodial rights over G.M., McGee had not identified her as an authorized pickup individual and staff did not require her to present comparable custodial documentation or verification before it released G.M. to her custody. McGee did not see staff approach the paternal grandmother or any interaction to provide custody documentation.

During McGee's subsequent parenting weeks, school personnel continued imposing heightened custodial scrutiny and participation standards that they did not impose on the father or other individuals involved in pickup. These interactions occurred in the presence of other parents, students and G.M., contributing to confusion and distress regarding McGee's parental authority and ability to interact with G.M. on school grounds.

On September 15, 2025, McGee contacted the school district office and reported concerns regarding school staff conduct, parental access restrictions and unequal treatment. A district employee advised McGee to communicate further with Bourne and stated that the district would ask Bourne to contact McGee directly. The next day, Bourne contacted McGee by telephone. During the conversation, McGee discussed the prior incidents involving pickup restrictions, custodial statements and unequal treatment. McGee also requested school registration

documentation and related records for use in her domestic relations proceedings. Rather than addressing McGee's complaints, Bourne proposed an alternative supervised interaction arrangement. In subsequent email communications, Bourne described the proposal as an effort to provide McGee a space where she could feel more comfortable, outside the office area around staff members.

McGee continued requesting enrollment-related records, policies, clarification concerning custodial procedures, parental access standards, educational participation procedures and equal treatment concerning school communications and participation. The school failed to meaningfully address many of her requests or provide responsive information. McGee repeatedly requested correction of her legal name in school systems and records, since they identified her by her former maiden name. The information remained uncorrected throughout G.M.'s attendance.

McGee communicated concerns to Bourne that school personnel continued to treat her poorly. No meaningful corrective action followed. McGee requested copies of school policies, procedures and standards relating to parental participation, records access, custodial verification and educational access. She did not receive the requested materials.

On October 10, 2025, McGee communicated her concerns about unequal treatment, parental access restrictions, custodial representations and school records in writing to Bourne. She also requested equal recognition of her parental status concerning G.M. During multiple interactions concerning G.M., school personnel directed communications primarily toward the father, failed to meaningfully respond to McGee's questions and concerns, minimized her participation attempts and interacted with her in a dismissive and exclusionary manner in front of G.M., thereby undermining McGee's parental participation and authority during school-related interactions.

McGee served subpoena requests for her divorce proceeding and repeatedly requested educational records, communications, enrollment materials, screening records and related documents concerning G.M. The school produced incomplete records, failed to produce certain historical and original materials, delayed responses and failed to meaningfully address McGee's concerns. Certain school communications and records referenced by staff were not accessible through McGee's available online parent access systems. Most records-related communications and interactions with the district were conducted primarily through the interim superintendent (Redelberger). McGee notified district personnel that the records production appeared incomplete and requested additional responsive records and clarification concerning the missing materials.

During follow-up interactions concerning the records requests and parental rights concerns, McGee informed district personnel that she believed the district was violating her parental and constitutional rights and that she was recording the interaction. District personnel then instructed her to leave the administrative office, without resolving her concerns. Despite repeated written and verbal notice, the district did not initiate corrective measures or formal grievance procedures, or meaningfully investigate the unequal treatment, custodial restrictions and records disputes.

McGee further attempted to resolve concerns through school personnel and district administrative channels consistent with publicly available district complaint procedures and parental involvement policies.

In written communications dated September 3, 2025, McGee informed school personnel that her family had religious objections to participation in certain holiday-related activities, celebrations, movies, curriculum and related classroom themes. McGee asked that G.M. not participate in holiday-themed activities, movies, projects or instruction involving birthdays, Halloween, Christmas, Santa Claus, ghosts and related subjects inconsistent with her family

religious beliefs and homeschool practices. McGee requested notice regarding any classroom activities or curriculum implicating those objections so that she could exercise parental direction and determine whether alternative arrangements or opt-out requests were necessary. Despite written notice of her religious objections and parental directives, the school did not give McGee meaningful clarification regarding accommodations, opt-out procedures or advance notice concerning such activities, content or alternative educational arrangements. While G.M. attended Lawson, she received classroom projects and materials associated with Halloween, Thanksgiving, Christmas, birthdays, classroom movies, ghosts, Santa Claus and related holiday themes. Holiday-related activities continued after McGee provided written notice of her objections. McGee did not receive meaningful advance notice or opt-out opportunities regarding multiple activities involving G.M.

On December 9, 2025, McGee received a school communication referencing a holiday-related movie, Christmas-themed activities and distribution of candy canes to students. By the time McGee received that communication, G.M.'s class had already engaged in holiday-related activities and projects. During a scheduled school meeting on December 9, 2025, which both parents attended with the school psychologist, G.M.'s teacher, Orbin and Bourne, among others, McGee requested curriculum-related documentation, records concerning G.M.'s educational progress, clarification regarding parental participation procedures and responses concerning her repeated concerns about unequal treatment and restrictions on parental rights. McGee further raised concerns regarding repeated custodial restrictions, lack of records access, unequal treatment and ongoing difficulties obtaining educational and policy-related information from the school. In response, without substantively addressing McGee's concerns, staff repeatedly stated that G.M. was "doing great," that they were "happy to have her" and that they loved G.M.

While G.M. attended Lawson, she had hearing, vision, dental and related student screenings. Screening information and follow-up communications were not equally or timely provided to McGee despite her parental status and repeated requests for equal access to school-related medical and screening information about G.M. McGee first became aware of at least two screenings after the father referenced them in separate communications concerning G.M.'s medical conditions. McGee contacted the school to request information and records concerning any health-related screenings involving G.M. The school gave McGee limited information concerning vision-related matters requiring physician follow-up and the father received screening-related information before McGee did. In response to McGee's parental records requests and subpoena requests, the school did not fully produce screening records. The only medical-related document the district produced was an immunization exemption form which the father had signed.

Throughout G.M.'s attendance, McGee communicated with school personnel regarding G.M.'s recurring illnesses and medical concerns, including respiratory illness, fever, vomiting, severe ear infections, bronchitis and related symptoms. McGee provided medical summaries, physician documentation, hospital summaries and related records to the school concerning G.M.'s medical condition and attendance-related issues. McGee further communicated concerns regarding G.M.'s emotional distress, adjustment difficulties and recuring illness symptoms. School personnel nonetheless repeatedly minimized or dismissed McGee's concerns. McGee formally contacted and alerted state authorities, including the Kansas State Board of Education, regarding the ongoing record restrictions and unequal treatment, yet the district failed to remediate its violations.

On December 15, 2025, after McGee and the father had withdrawn their divorce proceedings, they withdrew G.M. from Lawson and resumed homeschooling. The withdrawal

process did not require the father's physical presence, additional custodial verification or equivalent restrictions previously imposed on McGee.

**Analysis**

Plaintiff sues the Leavenworth School District, Interim Superintendent Redelberger, Principal Bourne and school counselor Orbin. She alleges the following claims: violation of her parental rights and due process rights under the Fourteenth Amendment (Count I), violation of her Fourth and Fourteenth Amendment rights (Count II), violation of parental rights and education access protections under Kansas law (Count III) and willful, wanton and reckless conduct (Count IV). Defendants seek to dismiss her claims for failure to state a claim on which relief can be sought, arguing that the complaint does not include sufficient facts to support any of plaintiff's claims. The individual defendants also assert qualified immunity, and the district argues that it cannot be held liable under Section 1983 for its employees' actions under Monell v. Department of Social Services, 436 U.S. 658, 694 (1978).

In response, plaintiff cites 22 exhibits, 21 of which are school district policies not referenced in her complaint. See Plaintiff's Combined Omnibus Response In Opposition To Defendants' Motions To Dismiss (Doc. #16) filed July 5, 2026. Plaintiff also makes new legal claims that are not present in the complaint, including that defendants tried to override an active joint custody order, usurped the exclusive jurisdiction of the state judiciary, did not comply with mandatory reporting policies and subverted a lawful subpoena, among others. On a motion to dismiss, the Court considers the four corners of the complaint, and may also consider (1) indisputably authentic copies of documents if plaintiff referred to them in the complaint and the documents are central to the claims and (2) facts which are subject to judicial notice. See GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1384 (10th Cir. 1997). Since plaintiff's

complaint does not refer to any specific school policies, they obviously are not central to her claims and the Court will not consider them. Likewise, the Court will not consider plaintiff's new allegations.

The Court now considers each claim in turn.

## I. Fourteenth Amendment Due Process Claim (Count I)

Count I alleges that the school district and the individual defendants, without substantive and procedural due process, violated plaintiff's Fourteenth Amendment liberty interest in G.M.'s care and custody. Plaintiff alleges that the school interfered with her constitutionally protected parental rights by the following conduct:

> 104. restricting Plaintiff's physical interaction and ordinary parental access to G.M. on school property;
> 105. requiring Plaintiff, but not similarly situated individuals, to provide additional custodial verification before recognizing Plaintiff's parental authority;
> 106. restricting Plaintiff's participation in school communications, educational access. And parental decision-making;
> 107. failing to provide Plaintiff equal access to records. enrollment materials, screening information, and school-related documentation;
> 108. continuing to rely primarily upon representations made by the father despite repeated notice and documentation concerning joint legal custody;
> 109. failing to reasonably investigate or correct Plaintiff's repeated complaints and concerns; and
> 110. maintaining or enforcing customs, practices, or decisions that treated Plaintiff differently from other similarly situated parents or custodial participants.

First Amended Complaint (Doc. #1-2) at ¶104–110. She alleges that defendants violated her right to equal protection because the school required her to provide extra custodial verification compared to similarly situated individuals before recognizing her parental authority, failed to provide equal access to records and maintained customs that treated her differently from other parents. Id. at ¶¶ 105, 107, 110.

Defendants seek to dismiss Count I, arguing that plaintiff has not alleged sufficient facts to state a plausible substantive due process, procedural due process or equal protection claim. Defendants also assert that they cannot be held liable for any claim in Count I due to qualified immunity of the individual defendants and lack of municipal liability under Monell.

The Court agrees that Count I does not allege facts which state a plausible claim that defendants violated her Fourteenth Amendment rights.

A. Substantive Due Process Claim

Plaintiff claims that by restricting her access to G.M., limiting her access to records and limiting her participation in school communication, among other things, defendants violated her substantive due process rights. Defendants seek to dismiss because the alleged facts do not show that defendants violated plaintiff's constitutional rights, and any alleged violation would not shock the conscience of the Court. Plaintiff responds that defendants intentionally misused government power to override a custody order, interfering with her parental rights and shocking the conscience, since defendants "(1) failed to correct their administrative perception of custody after receiving the birth certificate; (2) failed to verify the father's false narratives while imposing hostile barriers upon the biological mother; (3) failed to produce mandatory enrollment records or PowerSchool logs under the subpoena; (4) failed to execute mandatory internal tracking or contact law enforcement during the incident; (5) failed to heed Plaintiff's explicit grievances, instructing her to leave the office instead; (6) failed to remediate their discriminatory records entries, leaving Plaintiff listed under an obsolete maiden name (Lanway) for four consecutive months to purposefully distort her maternal status; and (7) completely ignored Plaintiff's explicit religious objections to holiday-themed curricula while deliberately withholding required notice regarding unauthorized vision, hearing, and dental screenings forced upon the child" and physically removed

G.M. Plaintiff's Combined Omnibus Response In Opposition To Defendants' Motions To Dismiss (Doc. #16) at 12. Plaintiff further responds that defendants intentionally interfered with her familial relationship with G.M., violating Fourteenth Amendment substantive due process, citing Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty., 768 F.2d 1186, 1190 (10th Cir. 1985). She argues that defendants intentionally manipulated portal access, kept her maidan name in school records for four months and physically extracted the child from her care, all with intent to disrupt her maternal bond with G.M. Plaintiff's Combined Omnibus Response In Opposition To Defendants' Motions To Dismiss (Doc. #16) at 13-14.

"The touchstone of due process is protection of the individual against arbitrary action of government," Wolff v. McDonnell, 418 U.S. 539, 558 (1974), including the exercise of power without any reasonable justification in the service of a legitimate governmental objective. See, e.g., Daniels v. Williams, 474 U.S. 327, 331 (1986) (substantive due process protects against government power arbitrarily and oppressively exercised); County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). The Supreme Court recognizes two types of substantive due process claims: (1) claims that the government has infringed a fundamental right and (2) claims that government action deprived a person of life, liberty or property in a manner so arbitrary it "shocks the judicial conscience." Stepp v. Lockhart, 168 F.4th 1286, 1302 (10th Cir. 2026). The court applies the "fundamental-rights approach when plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief from tortious executive action." Id. Here, plaintiff does not challenge legislative action. In cases of "abusive executive action," only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." Lewis, 523 U.S. at 849 (citing Collins v. Harker Heights, 503 U.S. 115, 129 (1992)).

As the Tenth Circuit has noted, "the standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'" Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 528 (10th Cir. 1998) (quoting Uhlrig v. Harder, 64 F.3d 567, 573 (10th Cir. 1995)). To satisfy this standard, "plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Id. Instead, plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Id. Generally, conscience-shocking behavior falls on the far side of the culpability spectrum, requiring plaintiff to show that the government actor performed with an intent to harm. Conduct that shocks the judicial conscience is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013) (quotations omitted). To show defendants' conduct is conscience shocking, plaintiff must prove a government actor arbitrarily abused his or her authority or employed it as an instrument of oppression. Id. "The behavior complained of must be egregious and outrageous." Id.; see Breithaupt v. Abram, 352 U.S. 432, 435 (1957). Plaintiff alleges that defendants infringed her parental rights, and her right of familial association, both of which are analyzed under the conscience-shocking framework. See Doe v. Woodard, 912 F.3d 1278, 1299 (10th Cir. 2019).

i. Parental Rights

The Fourteenth Amendment protects the right of parents to make decisions "concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000). Accepting plaintiff's factual allegations as true, she has not sufficiently alleged a substantive due process violation of her parental rights. Parents "simply do not have a

constitutional right to control each and every aspect of their children's education." Swanson v. Guthrie Indep. Sch. Dist., 135 F.3d 694, 699 (10th Cir. 1998). Plaintiff's complaint that staff did not permit her to stay with G.M. on school property does not shock the Court's conscience. See Flores v. Victory Preparatory Academy, 411 F. Supp. 3d 1149, 1162 (D. Col. 2019) (parents do not have constitutional right to access school property). Plaintiff's response is centered on September 10, when school officials did not allow her to wait outside with G.M. until the father arrived. The complaint alleges that the school released G.M. to plaintiff after school (¶ 52), that it was the father's turn to pick up G.M, that plaintiff and G.M. sat outside together waiting for the father (¶ 53), that staff then instructed G.M. to wait inside (¶ 56) and that the paternal grandmother later picked up G.M. (¶ 61). Plaintiff has not established that she had a right to wait for the father with G.M. on school property. Defendants' participation in this incident does not shock the conscience of the Court and does not state a plausible claim that they violated plaintiff's substantive due process rights.

Likewise, plaintiff's complaint that the school did not provide her with G.M.'s records, failed to correct her maiden name and failed to notify her of holiday activities are not conscience-shocking. Plaintiff generally alleges that the district did not provide her all of G.M.'s records, but her only specific allegations are that she experienced a two-week delay in getting PowerSchool access, got delayed notification of holiday-related schoolwork and did not receive a full production of "hearing, dental, and related screening records." First Amended Complaint (Doc. #1-2) at ¶ 93. Defendants fulfilled at least some of her requests, and the alleged deprivations do not rise to the level of a substantive due process violation. See e.g., Schmidt v. Des Moines Pub. Schs., 655 F.3d 811, 819 (8th Cir. 2011) (school did not violate substantive due process by not providing

schoolwork and information about attendance and athletic activities). On these facts, plaintiff has not stated a plausible claim for relief. See Twombly, 550 U.S. at 556.

ii. Right To Familial Association

A parental relationship is a constitutionally protected liberty interest under the Fourteenth Amendment's due process clause. Trujillo, 768 F.2d at 1189; J.B. v. Wash. County, 127 F.3d 919, 927 (10th Cir. 1997). A familial association claim must be based on allegations of abusive government authority. See Griffin v. Strong, 983 F.2d 1544, 1547 (10th Cir. 1993). A parent must allege that defendants intended to interfere with this right—the state actor must have directed conduct at the familial relationship "with knowledge that the statements or conduct will adversely affect that relationship." Lowery v. City of Riley, 522 F.3d 1086, 1092 (10th Cir. 2008). The right is not absolute, but must be weighed against the state's interest in protecting a child's health and safety. Youngberg v. Romeo, 457 U.S. 307, 320–21 (1982). In conducting this balancing, courts consider the severity of the infringement on the protected relationship, the need for defendants' conduct and possible alternative courses of action. See Griffin, 983 F.2d at 1548. To state a claim, plaintiff must have alleged that (1) defendants intended to deprive her of her protected relationship with her daughter, see Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1175 (10th Cir. 2013); and (2) defendants either unduly burdened plaintiff's protected relationship, see PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1199 (10th Cir. 2010), or effected an unwarranted intrusion into that relationship, Trujillo, 768 F.2d at 1190. This undue burden on the that relationship must be in a manner that was "egregious, outrageous, unrestrained, brutal, and a display of arbitrary power being used as an instrument of oppression." Doe v. Woodard, 912 F.3d 1278, 1301 (10th Cir. 2019) (internal quotes omitted).

The facts underlying plaintiff's familial association claim similarly do not shock the conscience of the Court. Plaintiff's response limits her argument to defendants' conduct of "manipulating portal access fields" (which presumably refers to PowerSchool), using plaintiff's maiden name for four months and the incident on September 10 where staff asked G.M. to return inside. Plaintiff's Combined Omnibus Response In Opposition To Defendants' Motions To Dismiss (Doc. #16) at 13-14.

The first two acts do not come close to shocking the Court's conscience, and they did not even arguably impact plaintiff's relationship with her daughter. Though the complaint and plaintiff's response include conclusory statements that defendants intentionally committed these acts, no alleged fact supports that claim. Even if defendants acted intentionally, the complaint did not allege facts that reach the required severity: a two week delay to access PowerSchool and use of a maiden name are not egregious, outrageous, unrestrained or brutal. Defendants asking G.M. to return inside to wait for a short time for her father is likewise not severe enough to shock the conscience.

Plaintiff cites Trujillo, 768 F.2d at 1190 (10th Cir. 1985) and Lowery, 522 F.3d at 1092 (10th Cir. 2008) to support her claims. Those cases are inapposite, as they involved death or over a decade of unjust incarceration which caused the deprivation of the familial relationship—which are not comparable to being unable to wait for a brief time with a family member on school property. The Tenth Circuit has found that temporary child separation may violate the right to familial association, but it was in much more severe situations. See e.g., Thomas v. Kaven, 765 F.3d 1183, 1195–96 (10th Cir. 2014) (plaintiff's daughter separated coercively for weeks in mental health ward); Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1248 (10th Cir. 2003) (child removed from home and placed under protective care for week).

The most apt comparison is Doe, 912 F.3d 1278, where the court found that even if a Department of Human Services caseworker had intentionally separated a child from her mother to conduct an examination without the mother, it was not sufficiently severe to allege an intended deprivation or suspension of the parent-child relationship that shocked the conscience. There, the search happened "during school hours" when the mother would not otherwise have been with the daughter, and the court found that even if the daughter would have wanted her mother to be present, it was a far cry from the substantial separation required in other cases. Id. at 1302. Likewise here, the alleged deprivation occurred during school operation (during pickup, after the dismissal bell) when the mother would not otherwise have been with G.M., since the complaint alleges that plaintiff was only there to return G.M.'s backpack and the father was to pick up G.M. In any event, defendants' short-term separation of plaintiff and G.M. to wait for pickup does not constitute an interference with family relationships which shocks the conscience of the Court.

B. Procedural Due Process Claim

Defendants seek to dismiss because the complaint does not allege a constitutional violation, so no process was due, and defendants made many remedies available to plaintiff. Plaintiff's response does not address this procedural due process argument and therefore forfeited that claim. See Brown v. Nationwide Ins. Co., No. 21-4122, 2023 WL 4174064, at *8–9 (10th Cir. June 26, 2023).

On the merits, procedural due process claims are evaluated under a two-step process: (1) whether a protected property or liberty interest implicates due process protections and (2) whether the procedures used to deprive plaintiff of that interest were constitutionally sufficient. Moore v. Bd. of Cnty. Comm'rs, 507 F.3d 1257, 1259 (10th Cir. 2007). Plaintiff's complaint and

her response to defendants' motions focus on September 10, the incident where staff asked G.M. to go inside and asked plaintiff to leave.

Assuming that plaintiff pled an infringement of a protected liberty interest, she has not alleged insufficient process. Where the government has deprived an individual of a protected interest, the Court weighs the following factors to determine whether that individual received due process: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. McDonald v. Wise, 769 F.3d 1202, 1213 (10th Cir. 2014).

Defendants argue that the facts alleged show that plaintiff did receive due process, since she discussed her issues with Bourne, served a records subpoena to which the school responded, engaged in the district's complaint procedures and formally contacted the Kansas State Board of Education. Defendants argue that the process which she received was more than adequate given the minor nature of the alleged deprivations. As noted, plaintiff does not respond to this argument, or allege what additional procedures defendants allegedly owed her. Procedural due process is concerned with the fairness of the process, not its actual outcome. The complaint shows that plaintiff had multiple opportunities to be heard. Since the magnitude of the alleged deprivations are slight, plaintiff has not plausibly established that the procedural process which she received was unconstitutional.

Plaintiff has failed to state a procedural due process claim upon which relief can be granted. Accordingly, the Court dismisses her procedural due process claims.

C. Equal Protection Claim

Count I alleges that defendants required plaintiff, but not "similarly situated individuals" to provide additional custodial verification, failed to provide plaintiff access to records and enforced customs, practices or decisions that treated plaintiff differently from similarly situated parents or custodial participants. First Amended Complaint (Doc. #1-2) at ¶¶ 105, 107, 110. It also alleges that the district maintained policies, customs, practices and administrative procedures concerning parental access, educational participation, student records, enrollment authority and complaint handling and that district personnel failed to reasonably apply such policies in an equal and constitutionally consistent manner. Id. at ¶ 113. The complaint does not allege who, specifically, was similarly situated or to what protected class plaintiff belongs. The complaint also does not identify what policies, customs or practices defendants failed to apply consistently, how it failed to do so, and as to whom it applied them inconsistently.

Defendants argue that plaintiff fails to state an equal protection claim because she failed to allege anyone who is similarly situated and her alleged facts do not support a plausible claim that anyone is actually situated similarly to her. Plaintiff responds that the father is similarly situated and that she has a class-of-one equal protection claim.

"Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215–16 (10th Cir. 2011). A plaintiff who does not allege membership in a protected class can bring a "class of one" claim by alleging that (1) she has been intentionally treated differently from others similarly situated and (2) no rational basis explains the difference in treatment. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Since the complaint does not allege that the father is similarly situated, plaintiff's responsive argument fails. In fact, Part B of plaintiff's response argues that the paternal

grandmother is the one who was similarly situated, which highlights the complaint's failure to identify who is similarly situated to plaintiff. The complaint does not allege that defendants acted without a rational basis in failing to require a similarly situated person to provide additional custodial verification, or in providing them access to records. Likewise, the complaint does not allege what customs, practices or decisions defendants enforced that treated plaintiff differently from similarly situated individuals. It fails to identify which individuals are similarly situated, how defendants failed to apply customs to them fairly and why no rational basis explains the difference. Under notice pleading standards, the Court must dismiss plaintiff's equal protection claim. See Robbins, 519 F.3d at 1248.

D. Qualified Immunity on Count I

The individual defendants argue that they can only be liable for conduct in which they personally participated, and Count I does not allege any constitutional violation that they personally committed, citing Griffith v. El Paso Cnty., 129 F.4th 790, 822 (10th Cir. 2025). They also argue that the conduct which they allegedly committed did not violate a clearly established statutory or constitutional right, so they are entitled to qualified immunity. Plaintiff responds that defendants acted with malice and had fair warning that their actions were prohibited since they violated district policies, which strips them of qualified immunity.

Qualified immunity shields government officials from liability for performing discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Defendants who assert qualified immunity in a § 1983 suit—including in a motion to dismiss—are presumptively immune from suit. Cuervo v. Sorenson, 112 F.4th 1307, 1314 (10th Cir. 2024). On a motion to dismiss, plaintiff can overcome the presumption if she

establishes that the complaint alleges factual content from which the Court can reasonably infer that (1) defendants' conduct violated a constitutional right and (2) that right was clearly established at the time of the alleged violation. Id.; see Iqbal, 556 U.S. at 678.

Whether a right is "clearly established" is an objective test. A constitutional right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Heard v. Dulayev, 29 F.4th 1195, 1203 (10th Cir. 2022) (citations omitted). Under this demanding standard, the alleged violation "must have a sufficiently clear foundation in then-existing precedent" either with "controlling authority or a robust consensus of cases of persuasive authority." Id. (citations omitted). The Supreme Court has warned against defining a clearly established right "at a high level of generality" and emphasized that the law must be "particularized to the facts of the case," but this does not mean that a right is only clearly established if a case exists that is factually identical. Est. of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019) (citations omitted). While the case need not be directly on point, the "existing precedent must place the lawfulness of the defendant's conduct beyond debate." Heard, 29 F.4th at 1203 (citations and brackets omitted).

Plaintiff's response does not establish that defendants' conduct violated a statutory or constitutional right, let alone one that was clearly established at that time. Plaintiff cites many cases, none of which are remotely particularized to the facts of the case. Est. of Ceballos, 919 F.3d at 1215; see e.g. Dubbs v. Head Start, Inc., 336 F.3d 1194, 1205–07 (10th Cir. 2003) (preschool subjected students to intrusive physical examinations, including genital examinations and blood tests, without parental consent); Garcia by Garcia v. Miera, 817 F.2d 650 (10th Cir. 1987) (teacher held girl upside down by ankles while principal hit her with paddle and otherwise beat her); Murrell v. School Dist. No. 1, Denver, 186 F.3d 1238 (10th Cir. 1999) (sexual assault of mentally disabled

student by another mentally disabled student; teacher told victim to tie clothing around her waist to cover up blood and not to tell her mother). Since plaintiff has not shown that defendants violated a clearly established constitutional right, the individual defendants are entitled to qualified immunity on Count I. See Cuervo, 112 F.4th at 1314.

E. Municipal Liability On Count I

The district moves to dismiss plaintiff's claims against it under Monell, since the complaint does not allege that a district custom or policy is itself liable for an alleged constitutional violation. Plaintiff responds that when a public institution receives notice of an ongoing constitutional violation and decides to execute a policy of inaction, such actions constitute administrative ratification under Section 1983, citing Murrell, 186 F.3d at 1249, among others. She argues that the district board's failure to intervene constitutes a custom of ratification.

Local governments or municipalities, including school districts, can be held liable for their employees' actions if they were taken pursuant to "official policy." Id.; Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). To allege liability under Monell and its progeny, plaintiff must allege (1) a constitutional violation by a municipal employee, (2) the existence of a municipal custom or policy and (3) a direct causal link between the custom or policy and the violation alleged. See Monell, 436 U.S. at 694; Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993). In other words, the custom or policy must be the "moving force" behind the violation. Franzese v. USD 229 Blue Valley, 767 F. Supp. 3d 1114, 1120 (D. Kan. 2025). A municipality may be held liable for a "custom" if the discriminatory practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." Murrell, 186 F.3d at 1249. Outside a custom or policy, a municipality can be held liable for decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority

was delegated, or the deliberately indifferent failure to adequately train or supervise employees. Pyle v. Woods, 874 F.3d 1257, 1266 (10th Cir. 2017). Defendant aptly argues that plaintiff's complaint identifies no policy or custom that is the moving force behind any alleged constitutional violation.

As stated above, plaintiff has not sufficiently alleged that district employees violated her constitutional rights. Further, her complaint does not allege that the employees followed a policy that was the "moving force" behind any violation, that the discriminatory practice was so well settled to constitute a custom, or that the district failed to train or supervise its employees. She alleges that she reported violations and that the district did not adequately intervene. Ratification occurs "when an employee is given authority to make decisions that are subject to a final policymaker's approval and that policymaker approved both the decision and its basis." Smith v. USD 480 Liberal, 682 F. Supp. 3d 980, 992 (D. Kan. 2023) (citing Brammer-Hoelter v. Twin Peaks Charter Academy, 602 F.3d 1175, 1189 (10th Cir. 2010)). The complaint does not allege any specific action by a final policymaker, nor does it allege that the district approved any of the employees' actions. "Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy." Brammer-Hoelter, 602 F.3d at 1188. Therefore, the district cannot be held liable under Count I.

## II. Fourth Amendment Violation (Count II)

Count II is limited to the events on September 10, and alleges that when staff directed G.M. inside while plaintiff and G.M. were waiting on the school lawn for the father, defendants violated plaintiff's Fourth and Fourteenth Amendment rights. The Court addressed plaintiff's Fourteenth Amendment arguments in the previous section, including her liberty interest in the custody of her

child. As to the Fourth Amendment, defendants seek dismissal because plaintiff does not allege any unlawful search or seizure of her own person, or any facts that would support a finding that defendants conducted an unlawful search or seizure. Defendants also assert qualified immunity and failure to allege municipal liability under Monell. In response to defendants' motions to dismiss, plaintiff argues that by escorting G.M. back into the school, the school officials conducted an "unreasonable governmental seizure of the child." Plaintiff's Combined Omnibus Response In Opposition To Defendants' Motions To Dismiss (Doc. #16) at 9.

The Court doubts that such actions could be considered an unlawful "seizure" of G.M., but in any case, plaintiff cannot assert G.M.'s Fourth Amendment rights, since such rights are personal and may not be vicariously asserted. J.B., 127 F.3d at 928 (mother could not bring Fourth Amendment claim on behalf of daughter seized from home).

Under 28 U.S.C. § 1654, "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." This statute allows litigants to proceed either *pro se* or through counsel, not in any other manner. The statute does not permit *pro se* litigants to represent other parties, even their own children. See Zhu v. Countrywide Realty Co., Inc., 160 F. Supp. 2d 1210, 1225–26 (D. Kan. 2001) (citing Meeker v. Kercher, 782 F. 2d 153, 154 (10th Cir. 1986) (*pro se* litigant had right to appear *in propria persona*, but did not have right to represent daughters)). The Tenth Circuit has specifically held that "under Fed. R. Civ. P. 17(c) and 28 U.S.C. § 1654, a minor child cannot bring suit through a parent acting as next friend if the parent is not represented by an attorney." Meeker, 782 F.2d at 154. Therefore, plaintiff cannot assert a violation of G.M.'s Fourth Amendment rights, and the defendants' motions to dismiss Count II are sustained.

Further, the individual defendants are entitled to qualified immunity on Count II and the district is not subject to municipal liability under Monell. Plaintiff has not alleged that the individual defendants violated a clearly established constitutional right, or that a district custom or policy led to the alleged violation. See discussion supra Part I.D and I.E.

**III. Kansas Law Violation (Count III)**

Defendants seek to dismiss Count III, entitled "Violation Of Parental Rights And Educational Access Protections Under Kansas Law," for failure to plead minimal factual allegations to state a plausible claim. Plaintiff's response does not address this argument.

Count III alleges that "[p]laintiff references Kansas parental-rights protections, educational-record protections, and related statutory duties as evidence of recognized parental interests and standards applicable to Defendants' conduct." First Amended Complaint (Doc. #1-2) at 17. Count III does not purport to state a claim for relief, but only to demonstrate that Kansas law recognizes certain parental rights. It cites no specific laws and does not tie them to specific facts. Plaintiff has not alleged a sufficiently plausible claim for relief, and Count III does not provide defendants fair notice of an actionable claim under Rule 8(a)(2), Fed. R. Civ. P. Robbins, 519 F.3d at 1248 (10th Cir. 2008). Further, plaintiff abandoned Count III by not addressing it in her response. See Brown, No. 21-4122, 2023 WL 4174064, at *8–9. Therefore, defendants' motions to dismiss Count III are sustained.

**IV. Willful, Wanton and Reckless Conduct (Count IV)**

Defendants move to dismiss Count IV, which alleges willful, wanton and reckless conduct in violating plaintiff's parental and constitutional rights, since it is premature and plaintiff's allegations do not rise to the level of a constitutional violation, let alone wanton conduct. Plaintiff's response does not address this argument.

As explained above, plaintiff failed to allege a plausible claim for a constitutional violation, much less wanton conduct. Further, plaintiff abandoned the claim by not addressing it in her response. See id. Therefore, defendants' motions are sustained as to Count IV.

**IT IS THEREFORE ORDERED** that Defendants Dr. Cathy Redelberger, Stefanie Bourne, And Jenny Orbin's Motion To Dismiss (Doc. #9) and Defendant USD 453's Motion To Dismiss (Doc. #10) both filed June 25, 2026 are **SUSTAINED.**

**IT IS FURTHER ORDERED** that the case is **DISMISSED WITH PREJUDICE.** The Clerk is directed to enter judgment for defendants.

Dated this 28th day of October, 2026 at Kansas City, Kansas.

/s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge